UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

WILLIE WARREN

                       Plaintiff,

          -against-

COUNTY OF NASSAU, NASSAU COUNTY
DEPARTMENT OF PUBLIC WORKS, THOMAS
R. SUOZZI, in his individual and official capacity,
Deputy Commissioner of the Department
of Public Works, RUSSELL RINCHIUSO,
in his individual and official capacity, Personnel
Manager MARION EXXON, in her official and
individual capacity, DOUGLAS CUCCI, in his
individual and official capacity, PAUL YANATANO,
in his individual and official capacity, Highway
Maintenance Supervisor JOHN GALLO, and in
his individual and official capacity.

                    Defendants.

-------------------------------------------------------------------X

WILLIE WARREN,

                    Plaintiff,

          -against-

COUNTY OF NASSAU, NASSAU COUNTY
DEPARTMENT OF PUBLIC WORKS, and County
Executive THOMAS R. SUOZZI, in his official capacity,
Highway Maintenance Supervisor JOHN GALLO,
in his individual and official capacity.

                    Defendants.

-------------------------------------------------------------------X

**Docket No.:**CV-06-3560
(WFK)

Docket No.: CV-09-1614
(WFK)

## PLAINTIFF'S TRIAL MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

The Plaintiff, Willie Warren (hereinafter Mr. Warren and/or Plaintiff) by and through his attorneys, the Law Offices of Frederick K. Brewington, respectfully submits this Trial Memorandum of Law in preparation of the trial to be held before with Your Honor against Defendants County of Nassau (County), Nassau County Department of Public Works (NCDPW), Thomas R. Suozzi, Russell Rinchiuso, Paul Yanatano, and John Gallo (collectively County Defendants)[1]. Plaintiff brings these two causes of actions – *Warren 2006*[2] and *Warren 2009*[3] – pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (as amended), 42 U.S.C §§ 1981, 1983 (including municipal liability and as per First and Fourteenth Amendment violations), 1985, 1986, and 1988, New York State Executive Law § 296 et seq., and for breach of contract and fraud.

Specifically, in *Warren 2006*, the Plaintiff alleges that the Defendants, acting individually and collectively, did intentionally and knowingly seek to wrongfully deprive Plaintiff of equal terms and conditions of employment by way of: excessive scrutiny and creation of a hostile work environment based on race and opposition to discriminatory practices, and bad faith inducement into signing a July 2003 *Stipulation of Settlement*, wherein Plaintiff specifically relied on Defendants' promises of good faith, fair dealings and non-discriminatory treatment, and was thereby induced into withdrawing Plaintiff's valid, potential claims in Federal Court, in relation to a prior, fifteen year history of continuous and ongoing denied promotions, unequal pay title and position, hostile work

---

[1] On April 18, 2008, the parties entered into a Stipulation discontinuing, without prejudice, all claims against Defendants Marion Exxon, now deceased, and Douglas Cucci, now deceased, and on February 8, 2013, all claims against Defendant Russell Rinchiuso, now deceased, were dismissed without prejudice.

[2] *Warren v. County of Nassau, et.al.,* Docket No.: CV-06-3560 (RMM)

[3] *Warren v. County of Nassau, et.al.* Docket No.: CV-09-1614 (RMM)

environment, misrepresentation, misinformation, harassment, character assassination, and breach of implied and express contract, based on race, color and retaliation. In *Warren 2009*, Plaintiff re-alleges that the Defendants, acting individually and collectively, intentionally and knowingly sought to, and did, wrongfully deprive Plaintiff of equal terms and conditions of employment, and that Defendants retaliated against Plaintiff by way of: committing and continuation of wrongful actions including selective enforcement, excessive scrutiny, chilling of public speech, deprivation of property rights, retaliation and creation of, and continuation of, a hostile work environment based on race and opposition to discriminatory practices based on race, color and retaliation.

Plaintiff submits this Trial Memorandum of Law to outline the facts expected to be developed at trial, and some of the applicable legal principles.

## STATEMENT OF FACTS

### *WARREN 2006*

### *Defendant's Discriminatory Treatment of Plaintiff Warren:*

On May 20, 1986, Plaintiff William Warren was hired as a laborer with the defendant Department of Public Works, and was promoted to the job title of Equipment Operator I the following year. Throughout the seventeen years from 1987 through 2003, Plaintiff had inquired about, sought and put in for promotions to Equipment Operator II on a regular basis. Plaintiff had the skills, ability, seniority and qualifications for such a position, yet was denied said position or any other such promotion, while white individuals with less seniority and fewer qualifications were promoted. Plaintiff remained as an Equipment Operator I in the Highway Maintenance Yard of the Department of Public Works, from 1987 until his August, 2003 transfer to an Equipment Operator III.

Plaintiff sought a promotion to Equipment Operator II. At that time, Linda Alberti, a white female and a clerical worker, was promoted to the position of Equipment Operator II, effective June, 1995 (instead of Plaintiff). In January 1997, Vinny Viviano, a white male, was also promoted to the position of Equipment Operator II . Neither Ms. Alberti, nor Mr. Viviano possessed commercial drivers' licenses, which was required as qualifications for an Equipment Operator II position.

Through the union, Plaintiff filed a grievance for Defendants failure to promote him, and the promotion of Ms. Alberti. At the December 2, 1997 hearing, Arbitrator Scheinman orally ruled that (a) the appointment of Linda Alberti to Equipment Operator II violated the Agreement, (b) that the County should cease and desist from violating the Collective Bargaining Agreement, and ( c) that the County should remove Alberti from the Equipment Operator II position. Defendants County and NCDPW refused to remove Alberti from said position, and *further promoted* Ms. Alberti, to the position of Labor Supervisor.

On September 18, 1998, a second arbitration hearing was held before Arbitrator Scheinman, on behalf of Plaintiff and other charging parties, with respect to the County's second promotion of Ms. Alberti, from Equipment Operator II to Labor Supervisor. In December of 1998, Arbitrator Scheinman issued two binding decisions. With respect to the 1996 promotion of Linda Alberti to Equipment Operator II, the Arbitrator found said promotion to violate the Union contract, holding that Alberti was not the best qualified candidate for such promotion, as per the criterion for promotion contained in said CBA. The arbitrator further found that: (a) "the evidence is persuasive that Linda Alberti did not have superior ability to perform the position " – assigning significance to Alberti's lack of experience in the field, lack of a Commercial Drivers License (CDL), and lack of routine driving; (b) there was no dispute that Alberti was not the senior candidate; and ( c) that

3

adaptability was not at issue. Arbitrator Scheinman further ordered that the County remove Ms. Alberti from the Equipment Operator II and Labor Supervisor position. In outright defiance of the Arbitrator, Defendant County filed an Article 78 Petition, challenging Arbitrator Sheinman's decision to remove Alberti from her Equipment Operator II position. By Order of the Supreme Court, dated December 14, 1999, Arbitrator Sheinman's findings we upheld.

For the period 1988 through 2002, Plaintiff regularly sought promotion to a position of Equipment Operator II, and was repeatedly denied said promotion, or any other promotions that would have sprung from such a title/position. During this same time period, Defendants County and NCDPW promoted numerous Caucasian employees to this position. Four such employees included Linda Alberti, Tony Vivano, Tony Briano and James Toto.

For the period 2000 through 2002, Defendants County and NCDPW continued to condone the discriminatory treatment of Plaintiff, by denying said treatment's existence, fighting Plaintiff's attempts to seek redress through the State Division of Human Rights, and refusing to abide by the 1998 and 1999 rulings of Arbitrator Scheinman and the Supreme Court, regarding filling promotions in accordance with the guidelines set forth in the Collective Bargaining Agreement, Section 12-2.

As evidenced by a tape recording of racist comments and conversation by Ms. Alberti, and Defendants failure to promote or advance Plaintiff Warren's was based upon the racist animosity towards Blacks held by the County, NCDPW, and its high-ranking officials, policy makers and supervisors. On October 24, 2002, Andrew J. Petti, Plaintiff's then-immediate supervisor and a Labor Supervisor II, tape recorded a telephone conversation that he had with Ms. Alberti . During this tape recorded telephone conversation Ms. Alberti stated that Mr. Warren was not promoted, because Defendant Rinchiuso and Head Personnel officer Marion Exxon "cannot stand that nigger

4

[Mr. Warren]", and because Defendant "Russell [Rinchiuso] did not want to make the nigger [Mr. Warren] at all." During said tape recorded conversation, Ms. Alberti expressly described a conspiracy, meeting and agreement within the NCDPW, in an attempt to make sure that Plaintiff did not get promoted, based on their disdain for Plaintiff's race, and in retaliation for Plaintiff's history of opposing discrimination – i.e., Plaintiff's "always fucking grieving people" and having "so many complaints against the County" – as stated by Ms. Exxon to Ms. Alberti.

Alberti's use of the phrase "nigger" more than eight times during the telephone conversation to refer to Plaintiff, her use of other derogatory phrases against Hispanics, and her detailed description of a meeting between high-ranking County and NCDPW officials for the purpose of hindering Plaintiff's promotions after his grievances and State Division complaint, all raise an indisputably strong inference that Plaintiff (and other African-American employees) were denied advancement because of the racist and retaliatory attitudes that permeated the Defendants.

### *Stipulation of Settlement*

For the period November 2002 through July 2003, Plaintiff and Defendants - particularly the COUNTY , DEPARTMENT OF WORKS and SUOZZI, embarked upon correspondence and discussions, with respect to a potentially amicable resolution of Plaintiff's then existing State Division and EEOC Charges of discrimination based on race and color, SDHR. Case No. 9D-E-R-97-3503790-E (1997 complaint); EEOC Charge #16G973741.

On or about April 10, 2003, the EEOC issued a Right to Sue Letter for Plaintiff, and Plaintiff had until Monday, July 14, 2003 to commence a federal lawsuit, with respect to his claims of denied promotions, denied advancement, hostile environment and discrimination and retaliation, pursuant to federal and state anti-discrimination laws. On or about July 3, 2003, the COUNTY, NCDPW, and

SUOZZI sent Plaintiff a draft of a "Stipulation of Settlement and General Release" (herein "agreement" or "Stipulation") Under the proposed Agreement, Defendants set forth certain actions and promises that the COUNTY, NCDPW and SUOZZI promised to perform, in return for Plaintiff's withdrawing his EEOC and SDHR Charges of Discrimination, and not filing or commencing a lawsuit or further grievances, with respect to the conduct complained of, up until the date of the Stipulation of Settlement. One such promise by Defendants included a promise that Plaintiff would be promoted to a position of Equipment Operator III within the NCDPW In setting forth their proposed terms of the Stipulation, Defendants implied that they would act in good faith and fair dealings, as inherent in any contract.

In July 2003, Plaintiff agreed to withdraw his charges of discrimination and he entered into the Stipulation of Settlement and General Release (herein "Stipulation"). Said Stipulation was fully executed on July 28, 2003. Plaintiff carried out his promises, by withdrawing his prior charges of discrimination promptly in 2003, and did not file a suit in Federal court. In accordance with the Agreement, Plaintiff was transferred to the Defendant NCDPW's Hempstead garage, to work in the promised position of Equipment Operator III.

On or about August 15, 2003, Plaintiff reported to work at his new location. Defendant Doug Cucci (white), Labor Supervisor II, became Plaintiff's new Supervisor. Within ten days of Plaintiff's reporting to the new location, Mr. Cucci stated **"all that bullshit that happened last year is not going to happen here**." It should be noted that although Plaintiff filed his complaint against the respondent in 1997, the issue became public knowledge when it was aired on television and in the newspapers in 2002. For the period August 2003 through the date of his death, Mr. Cucci would constantly make racist comments against and in front of Plaintiff – freely using the word "nigger."

6

On April 23, 2004, Plaintiff complained both verbally and in writing to Defendant Yanatano about the treatment he was receiving from Mr. Cucci. Mr. Yanatano stated that he was aware of some of Plaintiff's complaints, and he would "look into it." Plaintiff further submitted a complaint to Defendant Yanatano, dated April 27, 2004, referencing incidents of Mr. Cucci's harassment from April 21, 2004 and April 26, 2004.

While Defendant Yanatano claimed that he would "look into" Plaintiff's claims of unlawful discrimination neither Defendant Yanatono nor Defendant Gallo took any "investigatory steps" to address Mr. Warren's concerns or set forth a plan of action to redress Plaintiff's complaints of discrimination and retaliation.

Because of his race and color, Mr. Warren continued to be repeatedly passed over for promotion to a supervisory position on a regular basis – a position for which he is qualified. Said failure to promote Plaintiff continued to occur on a regular basis; from his transfer to the NCDPW Hempstead Garage in 2003 to the date on which Plaintiff was forced to leave work. For the period 2003 through the filing of *Warren 2006*, there were at least seven (7) individuals – all white males - with less seniority and education than Mr. Warren, who were promoted to the position of supervisor.

Plaintiff continuously and expressly sought out promotion after his August, 2003 transfer, had the qualifications for same, and was denied such promotion or advancement without reason or legitimate justification. During this same time period, Defendants County and NCDPW continued with a systemic pattern, practice and custom of treating Plaintiff and other African-American employees disparately to their similarly situated Caucasian employees.

As a result of the continuous, ongoing pattern and practice of denying promotions and

advancements to the qualified, seasoned Plaintiff, combined with the racist, hostile work environment and bad faith betrayal of Plaintiff after the 2003 stipulation, Plaintiff sustained severe, persistent and permanent emotional and psychological trauma and damages.

### *WARREN 2009*

Following the filing and commencement of discovery in *Warren 2006*, Plaintiff continued to be subjected to a serious of wrongful discriminatory and retaliatory actions by Defendants including but not limited to Defendant Gallo. In the early part of 2007, Plaintiff was subjected to having the lug nuts on his work vehicle loosened and / or removed in an act of sabotage, retaliation and abuse. Plaintiff reported this action taken against him, however Defendants County, NCDPW and Gallo refused and failed to take any action, failed to conduct any meaningful investigation, and never reported back to Plaintiff what actions, if any, were taken or were to take place.

In or about 2007 and 2008, Plaintiff complaints were routinely and systematically ignored and Defendants. Defendants refusal to properly address the concerns of Plaintiff and other minority employees within the NCDPW, resulted in an atmosphere tacitly and directly perpetrating, allowing, and encouraging unconscionable acts – such as the display of a *hangman's noose*. Plaintiff promptly reported and immediately brought the offensive and discriminatory act of displaying a hangman's noose to the attention of his supervisor, Defendant Gallo. No further action was taken by Defendants to address or remedy this incident, nor was Plaintiff offered any assurances that the party responsible for chilling his speech, and affecting this work place who displayed/committed this egregious and hateful act would be located and disciplined. Instead comments were made to Plaintiff that he should not be upset and that he should just ignore this symbol of abuse and racial terrorism.

8

While nothing was done to address the hangman's noose, on March 10, 2008, Plaintiff was sent home by Defendant Gallo without any notice or explanation and told that he could not come back *"until further notice"*. This action was clearly done in response to Plaintiff bringing facts to light about the hangman's noose, complaining about the ongoing abuse and opposing the regular abuse to which he was subject. The attempt of Defendants to silence Plaintiff and remove Plaintiff was carried out in a callous and abusive way, consistent with the manner in which Defendants had conducted themselves in dealing with Plaintiff ever since he sought to oppose all the discriminatory actions that were raised in every SDHR Complaint and the *Warren 2006* Complaint.

Mr. Warren asked why he was being sent home and why he was being treated in this fashion and then wrote a letter asking what was this about and was not responded to in any way. He was deprived of his employment and his pay. Mr. Warren was to have been paid his entire bi-weekly salary on March 27, 2008, however, he was not paid any part of his salary. In fact was told he was not being paid. In essence, Defendants stole Mr. Warren's livilihood.

Due to this mental and actual retaliation and discrimination Plaintiff was forced to then pursue a disability claim and seek some form of compensation since his ability to make a living was taken from him. Despite his objections to being forced from his job the Defendants made no efforts to provide or accommodate him to allow him to remain employed and continue to be paid. Instead, Defendants summarily took away Mr. Warren's means of feeding his family and earning a living. This action and this behavior by the County as a further act of retaliation and forced Plaintiff to file yet another complaint with the SDHR.

As a result of the above referenced and ongoing actions of Defendants, Plaintiff sustained severe, persistent and permanent emotional and psychological trauma and damages, developed job-

related mood disorders, and further developed anxiety, depression, insomnia, disrupted eating patterns, shortness of breath, severe headaches, and other such physical symptoms and ailments.

## ARGUMENT

### POINT I

### PLAINTIFF'S TITLE VII CLAIMS ARE TIMELY, ARE NOT BARRED BY THE STATUTE OF LIMITATIONS, AND CONSTITUTE A CONTINUING VIOLATION.

Title VII requires that an employment discrimination claimant pursue administrative procedures before commencing a lawsuit and imposes a deadline for the initiation of such procedures. *Fitzgerald v. Henderson*, 251 F3d 345, 359 (2d. Cir. 2001) In a state, such as New York, which maintains an administrative mechanism for the investigation and resolution of employment discrimination claims a plaintiff must file administrative charges with the EEOC no more than 300 days after the alleged discriminatory acts, as a precondition to maintaining an action in federal court. 42 U.S.C. §2000e-5(e); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 202 (2002); *Tewksbury v. Ottaway Newspapers*, 192 F3d 322 (2d Cir 1999)

An exception to this rule is provided by the continuing violation doctrine. Under that doctrine, if a plaintiff has experienced a " 'continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'". *Fitzgerald, Id., citing Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir.1992) (quoting *Miller v. International Telephone & Telegraph Corp.*, 755 F.2d 20, 25 (2d Cir.), cert. denied, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985)); see also *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 274-75 (2d Cir.1981) (consistent pattern of discriminatory hiring practices from 1971 to 1975 held to constitute a

continuing violation), cert. denied, 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). "If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996); see, e.g., *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir.1993) ("Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEO [ ] charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."), cert. denied, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). Although the continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination, and although acts so "isolated in time ... from each other ... [or] from the timely allegations[ ] as to break the asserted continuum of discrimination" will not suffice, *Quinn v. Green Tree Credit Corp.,* 159 F.3d at 766, a continuing violation may be found "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994).

In the *Warren 2009* matter, Plaintiff has sufficiently set forth facts that demonstrate that since the filing of *Warren 2006,* the environment in which he was required to work was a hostile one. The removal of the lug nuts on the vehicle Plaintiff operated during his employment with the Defendants took place in August 2006, after the filing of *Warren 2006.* Plaintiff brought this incident to the attention of his immediate supervisor, Defendant Gallo. Mr. Warren was never informed of the results of any alleged investigation, nor was he informed that one had actually taken

11

place. As a result of this act of sabotage, each day Plaintiff became, and remained, fearful that the equipment he was assigned to operate was sabotaged, so as to cause him sever bodily injury, or even death. The hostility continued. In or about October 2007, Plaintiff arrived at work to find a hangman's noose hanging on the equipment he operated; a noose which brings about memories of the hanging of numerous African-American men in this country, prior to, during the Jim Crow era and today. Plaintiff again feared that he was in danger of sever bodily injury, or even death. Plaintiff brought this incident to the attention of his immediate supervisor, Defendant Gallo. Again, Mr. Warren was never informed of the results of any investigation, nor was he informed that one had taken place. The hostility continued. In or about March 2008, upon his arrival at work, Plaintiff was told to leave and go home. Mr. Warren was never given any written reason why he had to leave. Mr. Warren suffered, and continues to suffer loss of pay, benefits, stress, humiliation, all in retaliation for opposing discrimination, and on account of his race.

As a result of the Defendants continued hostile, retaliatory and discriminatory acts against him, on March 27, 2008 Mr. Warren filed a charge of discrimination with the NYSDHR, which dually filed with the EEOC. As the limitations period in New York would be 300 days from Defendants last discriminatory act, due to the work-share agreement between the EEOC and the NYSDHR. any and all discriminatory acts committed by the Defendants for the period June 1, 2007 through March 27, 2008, would be actionable. In addition, the act of sabotage in removing the lug nuts from Mr. Warren's equipment, the threatening act of leaving of the hangman's noose on his equipment, and Mr. Warren being told to go home, without any apparent reason, are acts which constitute a continuing violation. When facts of the failure to pay Mr. Warren for actual time he did work is coupled with the opposition he faced from Defendants when he applied for disability, there

is no question that the violations visited on him by Defendants were intentional and part of a concerted effort to harm him.

Based on the foregoing, Plaintiff Title VII claims are timely, are not barred by the statue of limitations, and constitute a continuing violation.

## POINT II

### PLAINTIFFS' CLAIMS, PURSUANT TO NEW YORK STATE HUMAN RIGHTS LAW, IS PROPER AS ASSERTED AGAINST ALL DEFENDANTS.

Under the former interpretation it was held that, "individuals who have significant supervisory authority, such as power to hire and fire employees, can be held liable under New York State Human Rights Law." *Infra. See also, N.Y.McKinney's Executive Law* § 296(1). The New York Court of Appeals has held that an employee is not individually subject to suit under NYHRL § 296(1) as an employer "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542 (1984) (per curiam); see also *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995) (*abrogated on other grounds in Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257 [1998]). However, whether an individually named Defendant has ownership interest or power to carry out personnel decisions made by others (the "economic reality" test relied upon by Defendants) is clearly not the only manner in which individuals may be held liable under the statute. See, *New York State Executive Law* § 296(6); see also, *Ahmed v. Compass Group*, 2000 WL 1072299 (SDNY 2000).

Section 296(6) of the NYHRL states that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article,

or attempt to do so." *See,* N.Y. Exec. Law § 296(6). Accordingly, "It is now settled precedent in [this jurisdiction] that an individual may be held liable under Executive Law § 296(6), for aiding and abetting discriminatory conduct. *Peck v. Sony Music Corp.,* 221 A.D.2d 157, 632 N.Y.S.2d 963 (1st Dept. 1995). "In interpreting this section of the statute, the Second Circuit...has found that 'a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [NYHRL]." *Tomka v. Seiler Corp,* 66 F.3d at 1317 (2nd Cir. 1995), (*abrogated on other grounds in Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257 (1998)); see also, *Perks v. Town of Huntington,* 96 F.Supp.2d 222, 228 (SDNY 2000); *Shepard v. Frontier Communications Servs., Inc.,* 92 F.Supp.2d 279, 287 (SDNY 2000); *Arena v. Agip USA Inc.,* 2000 WL 264312, at 3 (SDNY. 2000); *Lewis v. Triborough Bridge & Tunnel Auth.,* 77 F.Supp.2d 376, 380 (SDNY1999); *Romero v. Howard Johnson Plaza Hotel,* 1999 WL 777915, at 8 (SDNY 1999); *Oliver v. General Nutrition Ctr.,* 1999 WL 435208, at 3 (SDNY1999). The New York State Courts unequivocally follow this application of the rule. *See, Steadman v. Sinclair,* 223 A.D.2d 392, 636 N.Y.S.2d 325, 326 (1st Dept. 1996); Peck v. Sony Music Corp., 221 A.D.2d 157, 632 N.Y.S.2d 963, 963 (1st Dept.1995). In *Perks v. Town of Huntington,* 96 F.Supp.2d 222 (EDNY 2000), this Court held that *"Tomka* [and/or the aiding and abetting discriminatory conduct rule found in Section 296(6) of the NYHRL] is the law in this circuit and the 'actual participation' rule governs in this action." *Id* at 228.

As clearly demonstrated in the detailed statement of the facts (as to Defendants Thomas R. Suozzi, and John Gallo) and at tedious length in Plaintiff's Complaints, "the Complaint is replete with allegations that Defendants actually participated in the conduct giving rise to the Complaint." *Infra.* Accordingly, contrary to any of Defendants' contentions, "Plaintiffs [have] adequately alleged

that Defendants may be held liable as aider[s] and abetter[s] under § 296.6." *Perks v. Town of Huntington*, at 229.

## POINT III

### THE CLAIMS ASSERTED IN WARREN 2009 ARE NOT DUPLICATIVE AND ARE PROPERLY BEFORE THE COURT

A court must be careful, when dismissing a second suit between the same parties as duplicative, not to be swayed by a rough resemblance between the two suits without assuring itself that beyond the resemblance already noted, the claims asserted in both suits are also the same." *Curtis v. Citibank, N. A.* 226 F3d 133,136 (2d cir. 2000) Under claim preclusion, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Id.* at 139, quoting *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). Whether there is claim preclusion depends upon whether the same or connected transactions are at issue and the same proof is needed to support the claims in both suits or, in other words, whether facts essential to the second suit were present in the first suit. *Id.* citing *NLRB v. United Techs. Corp.,* 706 F.2d 1254, 1260 (2d Cir.1983). While claim preclusion bars relitigation of the events underlying a previous judgment, it does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit. *Id.,* citing *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1464 (2d Cir.1996)(emphasis added). The crucial date is the date the complaint was filed. The plaintiff has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events; plaintiff may simply bring a later suit on those later-arising claims. *Id.* (emphasis added)

Plaintiff filed his first complaint, *Warren 2006,* on July 19, 2006, and amended it as of right

on November 19, 2006. Two years later, in May 2008, Plaintiff informed the Court that he intended to amend the *2006* matter to include the continuous, non-stop, discriminatory conduct to which he was being subjected. After Defendants refused to allow Plaintiff to amend his complaint, Plaintiff exercised his right to file the within complaint, which alleges the hostile, discriminatory and retaliatory acts to which he was subjected. *Warren 2009* is substantially different from *Warren 2006* in that the facts alleged are different and occurred two years after the initial complaint. The parties to *Warren 2006* that are the same in the *Warren 2009* matter are the County of Nassau, Nassau County Department of Public Works, Thomas Suozzi, and John Gallo. The claims which Plaintiff now brings against Defendants did not arise out of the same occurrences which were asserted in *Warren 2006.* Mr. Warren exercised his right to bring a second cause of action for the hostile, retaliatory and discriminatory actions the Defendants subjected him to, subsequent to the filing of *Warren 2006.*

Based on the foregoing, the claims asserted in the instant matter are not duplicative, and therefore should not be dismissed.

<u>**POINT IV**</u>

**CONSOLIDATION OF *WARREN 2009* WITH *WARREN 2006*, IS COMPLICATED BY THE FACT THAT NO DISCOVERY OF THE ACTS COMPLAINED OF IN *WARREN 2009* HAS BEEN CONDUCTED AND DEFENDANTS CREATED THIS CIRCUMSTANCE KNOWING THAT IT <u>WOULD FURTHER DELAY THE *WARREN 2006* TRIAL SCHEDULE</u>**

Under Rule 42 if the Federal Rules of Civil Procedure, a court has the discretionary power to order consolidation when there is commonality of factual or legal issues. *Jamroz v. Blum*, 509 F. Supp 953, 956 (N.D.N.Y. 1981) *citing Waldman v. Electrospace Corp., 68 F.R.D. 281 (S.D.N.Y. 1975).* That indeed is the situation in this case. Where, however, delay or undue prejudice would

result from consolidation, a court generally ought to maintain separate actions. *Id., citing Farbenfabriken Bayer A.G. v. National Disillers & Chemicals Corp.,* 324 F. Supp 156 (S.D.N.Y. 1971). Defendant's actions in these cases has created the complex questions the Court and the parties now face. Plaintiff does not now object to the consolidation, however, Defendants are obligated to provide the discovery that they, to date, have failed to provide.

## POINT V.

### PLAINTIFFS' CLAIMS, PURSUANT TO 42 USC § 1981, IS PROPER AS ASSERTED AGAINST ALL DEFENDANTS.

"Unlike Title VII, where the Second Circuit has explicitly held that individual liability does not attach, the Second Circuit has held that individual liability is appropriate in certain circumstances under § 1981." *Infra.*

Clearly, Plaintiff, is an African American and a Black man, and as such is a member of a protected class and/or racial minority. Additionally, Plaintiff's Complaints enumerates, in detail, many of the ways in which all of the Defendants (individually and collectively) intentionally discriminated against them. (*See, above statement of the facts and Plaintiffs' Complaints*). Finally, the Complaints make it unmistakably clear that Defendants discriminated and retaliated against Mr. Warren by preventing Plaintiffs from the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship (i.e Plaintiffs' employment) (*See, above statement of the facts and Plaintiff's two Complaints*).

Even a superficial reading of the Complaint demonstrates that Plaintiff has gone far beyond the applicable pleading standards under the Federal Rules and have given Defendants more than enough notice as to their individual and collective discriminatory acts at issue in this action. The fact

that Defendants have sought to combine the cases for trial and deny Plaintiff discovery on Warren 2009 case is also to their own loss as they have waived any discovery from Plaintiff. All Plaintiff need show is that there exists "some affirmative link to causally connect the actor with the discriminatory action." *Whidbee v. Garzarelli Food Specialties, Inc*, at 75-76. Plaintiff have incontrovertibly alleged such a causal link against all the Defendants (*See, above statement of the facts and Plaintiff's Complaints*).

As such, Plaintiff will prevail on his claim against Defendants pursuant to 42 USC § 1981.

## POINT VI.

### PLAINTIFFS' CLAIMS, PURSUANT TO 42 USC § 1985(3), ARE PROPER AS DEFENDANTS' SERIES OF SEPARATE DISCRIMINATORY ACTS SUPPORTS PLAINTIFFS' CLAIM OF CONSPIRACY.

Section 1985(3) provides in part:

> If two or more persons...for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

(42 USC § 1985(3)

The Defendants may suggest that a claim pursuant to §1985 could not survive where (1) all of the alleged conspirators worked in a single entity and (2) the conspirators acted within the scope of their employment. The courts in this circuit, as does Plaintiff, disagree with any such representation of the rule. Plaintiffs concede that there is a divide among the courts regarding what is necessary for a §1985 claim to survive. Nevertheless, Plaintiffs' claim, under Section §1985,

18

satisfies the all applicable pleading standards.

"The primary case in the Second Circuit is *Girard v. 94th St. And Fifth Ave. Corp.*, 530 F.2d 66, 70-71 (2nd Cir 1976), *cert denied*, 425 US 974, 96 S.Ct. 2173 (1976), which held that § 1985(3) does not apply to the implementation of a <u>single policy</u> by a <u>single policy making body</u>" (*emphasis added*). *Wahad v. FBI*, 813 F.Supp 224 (SDNY 1993). In general, this Circuit follows the interpretation of *Girard, Id.*, which is that "there is no conspiracy if the conspiratorial conduct challenged is essentially a <u>single act by a single corporation</u> acting exclusively through its own directors, officers, and employment, each acting within the scope of his employment." *Roniger v. McCall*, 22 Fsupp. 2d 156 (SDNY 1998). However, in *Girard*, the Second Circuit explicitly recognized that a claim under § 1985 will survive if Plaintiff alleges the separate and distinct actions of different individuals in furtherance of a conspiracy to violate constitutional rights. *See Girard* at 71-72. The Second Circuit, particularly the district courts in this state, abide by this interpretation. See *Yeadon v. New York City Transit Authority*, 719 F.Supp. 204 (SDNY 1989).

In accordance with the above, Plaintiff's Complaints alleges countless discriminatory/retaliatory acts perpetrated by the defendants (individually or collectively) which is alleged to have violated Plaintiff's constitutionally-prescribed rights. In addition, Plaintiff alleges that the individual defendants committed said acts in furtherance of a conspiracy to violate Plaintiffs' civil rights. *See Warren 2006,* ¶68-76

These facts are merely a portion of the total discriminatory actions, by Defendants, that are listed in the Complaints. Should the Defendants wish to represent that activities such as: (1) the use of hangman's nooses (without recourse) as a means to intimidate minority employees, especially Mr. Warren (2) the loosening of lug nuts on Plaintiff's vehicle (without recourse) as a means to

intimidate Mr. Warren, (3) giving Plaintiff broken machines to operate, (4) training Plaintiff to work only on the North Side of Hempstead, and never permitting Plaintiff to work in South Hempstead, are done within the scope of employment and/or pursuant to the interests of the County, and therefore there can be no conspiracy, Plaintiff welcomes the admission.

As it is clear that the acts alleged are "continuing, separate instances of discrimination" as opposed to "a single act by a single corporation acting exclusively through its employees and agents each acting within the scope of his employment"(*Geiger v. E.I. DuPont Nemours & Co.,* supra), Plaintiff's claims pursuant to § 1985(3) will prevail as "the existence of a conspiracy is a finding of fact to be made at trial." *Wahad v. FBI*, at 232.

## POINT VII.

### PLAINTIFFS' CLAIMS, PURSUANT TO 42 USC § 1986, IS PROPER

As shown above, Plaintiff alleges sufficient claims to establish a conspiracy under § 1985(3). "if [Defendants were and/or are] able to prevent the commission of a 1985(3) conspiracy between [themselves] and the other [Defendants] and failed to do so, [they] will face liability under § 1986." *Wahad v. FBI*, at 232. "One who knows of and has the ability to aid in preventing a § 1985 conspiracy has a duty to do so. If that person declines to take steps preventing that conspiracy he or she shall be liable to the injured party for damages which could have been prevented. *Id.* citing 42 USC § 1986.

Defendants may assert that Plaintiff made only bare conclusory allegations that the Defendants had knowledge of the conspiracy and failed to prevent same. Plaintiff can easily refute any such contention. A review of the Complaints for *Warren 2006* demonstrate the support for

20

Plaintiff's contentions: Paragraphs 68-76 of *Warren 2006* contain allegations that Plaintiff made complaints about the discrimination he faced at Nassau County, which were disregarded by Defendants. "Just as the existence of a conspiracy...is a finding of fact to be made at trial, the issue of whether defendants participated in or could have prevented such a conspiracy, if one is found to exist, will be left for trial." *Wahad v. FBI*, at 232. Thus, the above-listed paragraphs are demonstrative of Defendants knowledge of, and participation in and failure to prevent and intervene. Plaintiff's claims under section 1986 must prevail.

## POINT VIII.

### PLAINTIFF'S CLAIMS IN *WARREN 2006* CONCERNING ACTIONS OCCURRING PRIOR TO THE SETTLEMENT AGREEMENT ARE NOT BARRED BECAUSE DEFENDANTS BREACHED THE SETTLEMENT AGREEMENT.

#### A.   Defendants' breach of the settlement agreement:

In July 2003, Mr. Warren executed a Settlement Agreement and General Release. The agreement memorialized the " compromise and settlement of all claims that [Mr. Warren] has against Nassau County" (*Agreement* ¶1) Pursuant to the agreement, Mr. Warren agreed to release Nassau County from liability for "any and all claims" [of discrimination] that occurred before and up to the date that Mr. Warren signed the agreement(*Agreement* ¶5). In consideration of Mr. Warren's release it was implied that the Defendants, among other things, would continue to adhere to the Human Rights Law of the State of New York, and that it would not discriminate and or retaliate against Mr. Warren on the basis of his race and color or opposing discrimination. Instead, the attacks against Mr. Warren escalated and became more malicious (Complaint ¶¶ 68-74; 25-29). In this respect, Defendants breached and/or violated the terms of the Settlement Agreement (*Warren 2006*

Complaint ¶¶ 57-60).

By entering into the *Agreement*, Plaintiff was lead to believe that Defendants would adhere to the Human Rights Law of the State of New York, and would cooperate with the Division in any review of this matter. When Mr. Warren realized that he was under attack, by Nassau without redress, Mr. Warren again sought the assistance of the NYSDHR in order to allow the NYSDHR to review Nassau's newest discriminatory actions and force Nassau to comply with the Human Rights Law of the State of New York. When called to the NYSDHR to address these issues, the County Defendants opposed Mr. Warren and refused to even address his claims.

Consequently, as further discussed below, Nassau's clear breach of the *Settlement Agreement* entitles Mr. Warren to pursue all of his claims against Defendants (including any and all claims that arose before the execution of the settlement agreement).

**B. The County Defendants' clear breach of the settlement agreement entitles Mr. Warren to pursue all of his claims against Defendants (i.e. any and all claims that arose before the execution of the settlement agreement, including the acts of all the Defendants)**

"Under New York law, as generally, a party may be estopped from raising a statute of limitations defense where his fraud, concealment, or deception prevented the plaintiff from timely filing his claim." See *Simcuski v. Saeli*, 44 N.Y.2d 442, 448-49, 377 N.E.2d 713, 716 (1978). "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment. *Buttry v. General Signal Corp.* 68 F.3d 1488, (2nd. Cir 1995); citing, *Heckler v. Community Health Services*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223 (1984). "A defendant may be equitably estopped from asserting the statute of

limitations "in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused [the plaintiff] to delay in bringing his lawsuit." *Id.*; citing, *Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 50 (2d Cir.1985); and *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir.1983). "In order to invoke equitable estoppel, a plaintiff must show that the defendant "wrongfully induced the plaintiff to refrain from timely commencing an action by deception, concealment, threats or other misconduct." *Overall v. Estate of Klotz,* 52 F.3d 398, (2nd Cir 1995); citing, *Zoe G. v. Frederick F.G.*, 208 A.D.2d 675, 617 N.Y.S.2d 370, 371 (2d Dep't 1994); and *Simcuski v. Saeli*, 44 N.Y.2d 442, 449, 406 N.Y.S.2d 259, 262 (1978) (discussing fraud, misrepresentations, or deception as grounds for estoppel); *Hoffman v. Hoffman*, 162 A.D.2d 249, 556 N.Y.S.2d 608, 609 (1st Dep't 1990) (listing fraud, misrepresentation, threat, or deception). "Because a person who seeks equity must do equity, a plaintiff invoking estoppel must show that he brought his action "within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Infra.* "Equitable estoppel, therefore, looks at the parties' conduct only to determine their relative blameworthiness in delaying the commencement of suit. *Id.* "An equitable estoppel cannot indefinitely extend the limitations period. Thus, 'once the circumstances inducing reliance are exposed, the plaintiff's obligation to timely file is reimposed'." *Buttry v. General Signal Corp.*, supra.

Defendants cannot deny that Mr. Warren actively and adamantly pursued his discrimination and retaliation complaints, against Nassau and its associates, from the genesis of said acts. In fact, the record is clear in great detail about the ways in which Mr. Warren sought redress for his complaints (both internally at Nassau County and with the EEOC and NYSDHR) since as early as 1997 continuing to the present. Plaintiff's Complaints contain allegations that Plaintiff made

23

complaints about the discrimination he faced at Nassau, which were disregarded by Defendants. More importantly, the aforementioned paragraphs contain allegations that the Defendants gave Plaintiffs reassurances that they would look into the complaints. Indeed, Defendants failed to live up to those assurances (for example, see Complaint at ¶¶ 56-60). Plaintiff did rely on the representations of Nassau, that it would look into the complaints. When Plaintiff realized that Defendants misrepresented that they were investigating their claims and that Nassau intended to do nothing regarding same, Plaintiff timely filed his complaints with outside administrative agencies (EEOC and NYSDHR) to protect his rights. In fact, the Complaints makes it clear that Mr. Warren was forced to file additional and amended complaints with the NYSDHR and EEOC as Defendants' discriminatory acts escalated and continued (Complaints at ¶ 68-72).

Plaintiff relied upon these misrepresentations with the good faith belief that Nassau Defendants would actually "adhere" to the terms and conditions of the agreement. Plaintiff was wrong. When it became apparent that Nassau never intended to "adhere" to the settlement agreement or its representations that it would investigate Plaintiffs' complaints (internally through its EEO department), Plaintiff timely instituted the instant actions against Defendants.

## POINT IX.

### PLAINTIFF'S RETALIATION WITH RESPECT TO HIS WORKER'S COMPENSATION AND LONG TERM DISABILITY CLAIMS ARE TIMELY AND ISSUES OF FACT EXIST REGARDING WHETHER DEFENDANTS INTERFERED WITH PLAINTIFF'S ABILITY TO PROCURE SAID BENEFITS

Plaintiff asserts that Defendants engaged in a continuos and systematic scheme, which caused Plaintiff to suffer from sever panic/anxiety attacks. Then, in furtherance of their retaliatory intent, Defendants continued their lies and deceitful actions - by misrepresenting the facts and strenuously

opposing the decision of the Workers Compensation Board, ensure that Plaintiff would be denied disability benefits. To be sure, Plaintiff does not assert that the Workers Compensation Board or the long term disability insurance carrier played a part in Defendants plan to make sure that Plaintiff would be denied disability benefits.

Here, the Plaintiff submitted evidence to establish material factual issues, as to whether the chain of discriminatory acts suffered by Plaintiff constituted a systemic policy and practice of discrimination by the defendant. It has been well-established that "under Title VII of the Civil Rights Act of 1964, the existence of a continuous practice and policy of discrimination serves to delay the commencement of the limitations period, until the last discriminatory act in furtherance thereof." *Johnson v. Nyack Hospital,* 891 F.Supp. 155, 162 (S.D. N.Y. 1995), *citing* Cornwell v. Robinson, 23 F. 3d 694, 703 (2d. Cir. 1994). 65306860

In *Cornwell,* the Second Circuit instructed:

> While discrete incidents of discrimination that are not related to discriminatory policies or mechanism may not amount to a continuing violation, a continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where as **specific and related instances of discrimination are permitted by the employer <u>to continue unremedied for so long</u> as to amount to a discriminatory policy or practice....**
>
> Where a continuing violation can be shown, the plaintiff is entitled to bring suit challenging all conduct that was part of that violation, even conduct that occurred outside of the limitations period."

Cornwell v. Robinson, 23 F. 3d at 703-704 [*Emphasis added*].

Based on the foregoing, Plaintiff has set forth sufficient evidence to establish Defendants' retaliation with respect to his Workers Compensation and long term disability claim.

## CONCLUSION

Based upon the foregoing, the Plaintiff will prevail on each and everyone of his causes of action.

Dated: Hempstead, New York
July 3, 2013

Respectfully Submitted,

LAW OFFICES OF
FREDERICK K. BREWINGTON

By: _____
FREDERICK K. BREWINGTON
*Attorneys for Plaintiff*
556 Peninsula Boulevard
Hempstead, New York 11550
(516) 489-6959